Vonderbank vs. Schmidt.

---

## No. 10,853.

### MATHIEU VONDERBANK VS. JOHN SCHMIDT.

1. Good will is the favor which the management of a business wins from the public, and the probability that old customers will continue their patronage and to resort to the old place.

2. It may be said to consist of those intangible advantages, or incidents which are impersonal, so far as the vendor is concerned, and attach to the thing concerned. When it consists in the advantage of location it follows an assignment of the lease of the location; and if not assigned, it passes to the lessee of the property at the termination of the lease.

3. A trade mark has no separate existence, but owes its existence to the fact that it is actually affixed to a vendable commodity; whereas, a trade name, or a fictitious name, may be considered as a *quasi* trade mark, a mere property which is somewhat allied to good will.

4. The only restraint the grant of good will imposes upon the *grantor* is to prevent his subsequent employment of his *own* name so as to deceive and mislead the public.

5. A *surname* may become *impersonal* when attached to an article of manufacture, and becomes the name by which such article is known in the market; and, in case of sale of the right to manufacture, the name passes also; though it does not pass as good will, but as trade mark.

6. By giving a particular name to a building, as a sign of a hotel business, a tenant thereby makes the *name* a fixture to the building, and the property of the landlord upon the expiration of the lease.

   One may consent to the employment of his own name as that of a place of refreshment, but if such consent be purely gratuitous, he may withdraw it at pleasure—particularly, if such name be his surname, it being personal to the proprietor, and not an element of good will of the business.

APPEAL from the Civil District Court for the parish of Orleans. Monroe, J.

---

*Buck, Dinkelspiel & Hart* for Defendant and Appellant:

The naked sale of the "good will" of a business does not transfer the right to the use of the vendee's name of trade. Good will embraces only the custom and advantage peculiar to the place, etc., and not that appertaining to the *person* of the vendee.

The wrongful use for purposes of business of one's name may be enjoined. The vendor is not estopped, by silence or inaction or even by a sale, with his knowledge and consent to another or second purchaser; the latter takes no greater right than his vendor had under the original sale by plaintiff.

*Bernard McCloskey* for Plaintiff and Appellee:

### GOOD WILL.

'There is considerable difficulty in deciding accurately what is included under this term *good will*. It seems to be that species of connection in trade which induces customers to deal with a particular firm. It varies in almost every case, but it is a matter distinctly appreciable, which can be preserved if the business be sold as a going concern." Wedderburn vs. Wedderburn, 22 Beav. 84. It is defined also as a possibility that the old customers will resort to the old place. Rawson vs. Pratt, 91 Ind. 9.

In Hudson vs. Osborne, 39 Law J. Ch (N. S.) 79, the bankrupt had a place of business designated and known as the "Osborne House." Plaintiff became the owner in bankruptcy proceedings against defendant. The bankrupt was enjoined from designating his place subsequently as the "Osborne House."

The name of this firm was an important consideration in the purchase thereof, inasmuch as it had been thoroughly advertised throughout the Union under that name.

"The name of a firm is a very important part of the good will of the business carried on by the firm. A person says, I have always bought articles at such a house of business; I know it by that name, and I send to the house of business identified by that name for that purpose. And when you are parting with the good will of a business you mean to part with all that good disposition which customers entertain toward the business identified by the particular name or firm, and which may induce them to continue their custom to it. That the name is a very important part of the good will of the business is obvious, when we consider that there are at this moment large banking and brewing firms and others who do not contain a single name of the individual name expressed in the firm." Cherton vs. Douglas, Johnson's Eng. Ch. 174; Rogers vs. Nowvill, 3 De G. M. & G. 614; Am. and Eng. Encyclopedia of Law, Vol. 8 (Good Will), 1368.

"Good will is of value, and can be bought and sold." C. C. 2448, 2449; 3 An. 17; 9 An. 229; 21 An. 391; 35 An. 60.

"Such sales are very common with us, and violate no law that we are aware of. The effect of such contracts on the public weal is too remote to be noticed." 3 An. 17.

The opinion of the court was delivered by

WATKINS, J.    For many years the plaintiff in this suit was engaged in the conduct and management of a hotel, which was kept in a rented building on Magazine street, in the city of New Orleans. It was kept on what is popularly known as the European plan, *i. e.*, rooms and lodging without board.    While thus conducted, this hotel was customarily styled and denominated the "Hotel Vonderbank," or "Vonderbank Hotel."

While thus conducting said hotel, the plaintiff was also engaged in a business on Common street, in said city, between Camp and St. Charles streets, under the name and style of "Café Restaurant Vonderbank," which consisted of a bar room, or saloon, and restaurant and a few rooms for lodgers.

Plaintiff represents that the theory upon which he conducted the two businesses was that his hotel on Magazine street was to be a boarding place for the patrons of his restaurant—the two being conducted co-operatively.

That in April, 1889, he made a sale of the place to Charles Dormetzer, who carried on the business for some time thereafter, though unsuccessfully, and assigned it to his creditors. An arrangement was made whereby it was conveyed to the defendant. Under the administration of Dormetzer and Schmidtt, the hotel was operated as it had been by the plaintiff, under the name "Hotel Vonderbank" or "Vonderbank Hotel," and he complains that it was done in plain violation of his rights and much to the detriment and injury of his business as a *restauranteur*.

Denying that defendant required or has the right to enjoy that privilege, petitioner enjoined his further use of his *name*, claiming damages, and from an adverse judgment he prosecutes this appeal.

The ground on which the defendant resists the plaintiff's demands is, that by his purchase from Dormetzer he acquired all the right, title and interest of said vendor in and to the "Hotel Vonderbank" or "Vonderbank Hotel," situated on Magazine street, including the good will of the business and establishment, and particularly such good will as said vendor acquired from the plaintiff, including the *name* or style of said hotel, which he, as a purchaser, is of right entitled to use and enjoy.

Plaintiff admits and claims that he sold to Dormetzer "the shelving, counters, tables, crockery, beds and bedding, and all other movable effects in the building known as the 'Vonderbank Hotel' (or 'Hotel Vonderbank'), situated on Magazine street * * * and used in connection with his business, now the property of said Vonderbank, together with the good will of said Vonderbank in and to said business."

The business of which the plaintiff is now the proprietor, as he was at the time of his sale of the hotel, is styled and advertised as "Mathieu Vonderbank, proprietor of Vonderbank's Café and Restaurant," situated at Nos. 126, 128 and 130 Common street.

It is further admitted and conceded that at the date of these transactions, the hotel was a going concern in full operation as the "Vonderbank Hotel," or Hotel Vonderbank," and that is so now.

It is of an interference with his restaurant business that plaintiff

·complains, on account of defendant's improper and unlawful use of his name in the style of his hotel. Neither in the sale of plaintiff to Dormetzer, nor in that of the latter to defendant, is there any mention of the name " Hotel Vonderbank " as a factor in the contract, it only appearing from the two acts of sale, that there was conveyed all the movable property belonging to the hotel situated in the building known as the Hotel Vonderbank, on Magazine street, together with the good will of said Vonderbank, and subsequently of Dormetzer, in and to said premises.

On this state of facts, the only question raised is, whether, under Dormetzer's purchase from Vonderbank, and his sale to Schmidt, including specifically the good will of the hotel establishment, the latter acquired, and is entitled to use, the *name* " Hotel Vonderbank" or " Vonderbank Hotel" as the style of his hotel. This must be determined by the true meaning of the term good will, as it is employed in commercial transactions. We have been referred to only three cases in our own reports in which the subject has been discussed, but in neither of which was discussed the particular question we have here, *i. e.*, what passes by the term good will in an act of sale.

The cases referred to are the following, viz.: Wentz vs. Vogte, 3 An. 16; Succession of Jouron, 21 An. 391; Bergamini vs. Bastian, :35 An. 60.

In treating of the good will of a market stall the court said in the .second case, that it is " understood (to be) the run of custom which the transferrer had attained by the patronage of his friends resorting to his stand to purchase, and, generally, from *the reputation his stand* had acquired as one at which good and wholesome meats are sold, and where customers were accommodated and fairly dealt with."

This definition appears to have been paraphrased from that of . Judge Story, which is frequently quoted by judges and authors. Story on Partnership, Sec. 99; Am. and Eng. Enc. of Law, Vol. 8, p. 1366, in which brief quotations from English adjudications are found.

The third of the three cases above referred to, treated of an act of sale of an eating house at No. 21 Royal street, city of New Orleans, which contained *no stipulation of good will* having been conveyed, the plaintiff's complaint being that his vendor had soon af-

terward begun a similar business at No. 18 Royal street, in viola-
tion of his contract.

But the court substantially held, that inasmuch as there was no
stipulation in the contract that the vendor should not resume busi-
ness in his own name, the injunction should be dissolved.

We have referred to those decisions for the sole purpose of show-
ing that our own jurisprudence affords no light on the present con-
troversy, and of illustrating the necessity of looking into the deci-
sions of other courts, and the opinions of text writers, for the cor-
rect solution of it. And we make the following quotations as con-
veying a clear idea of what good will is.

For instance, the Michigan court says in Chittenden vs. White-
beck, 50 Mich. 401: "Good will has been defined by this court to
be the favor which the management of a business wins from the
public, and the probability that all customers will continue their
patronage," or as stated by Lord Eldon in Crutwell vs. Lloyd 17 Veis.
335, say the court, "the probability that old customers will resort
to the old place."

The same court say in Williams vs. Farrand, 50 N. W. Rep. p.
446:

"Good will may be said to be those intangible advantages or in-
cidents which are impersonal, so far as the grantor is concerned, and
attach to the thing conveyed. When it consists in the advantage of
location it follows an assignment of the *lease* of the location."

Or as was previously said by that court in the Chittenden case:

"Good will attaches to the *property*, and in case of a lease, it be-
longs to the *lessee* only during its continuation.  *  *  * The claim
to an interest in the good will is *inseparable from the claim to an in-
terest in the lease, and when one falls the other falls with it.*"

To a like effect is the opinion of the same court as expressed in
Meyers vs. Kalamazoo Buggy Co., 54 Mich. 215.

A standard author, in his treatise on trade marks, discusses and
defines good will as an analogous right, and quotes with approval
the expressions of various English judges on the subject.

Thus from Wedderburn vs. Wedderburn, 22 Beav. 84, viz.:

"There is considerable difficulty in defining accurately what is
included under the term good will. It seems to be that species of
connection in trade which induces customers to deal with a particu-
lar firm.

From England vs. Downes, 6 Beav. 269, viz.:

" It is the chance or probability that custom will be had at a certain place of business, in consequence of the way in which that business has been previously carried on."

From Story on Partnership, viz.:

" It may be described to be the advantage or benefit which is acquired *by an establishment* beyond the mere *value* of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers *on account of its local position*, or *common celebrity*," etc. Sec. 90.

Browne's Law of Trade Marks, Secs. 525, 526. In further illustration of this principle we have selected the following paragraph from Williams vs. Farrand, as giving a careful analysis, from a commercial point of view, of what passes by an act of sale containing *no stipulation of good will*, viz.:

" A retiring partner conveys "—without stipulating good will—in addition " to his interest in the tangible effects, simply the advantages that an established business possesses over a *new* enterprise. The old business is an assured success, the new an experiment. The old business is a going business and produces its accustomed profits on the day after its transfer. It is capital already invested and earning profits. The continuing partner gets these advantages. The new business must be built up. The capital taken out of the old concern will earn nothing for months, and in all probability the first year's business will show loss instead of profit. For a time, at least, it is capital awaiting investment, or invested earning nothing. The retiring partner takes these chances, or advantages. He does not agree that the benefit derived from his *connection* with the business shall continue. He does not agree that the *old business shall continue to have the benefit of his name, reputation* or *service; nor does he guarantee the continuance of that patronage which may have been attracted by his name or reputation*. He does not pledge a continuance of conditions. *He takes out of the business an interest that he contributed to the success of the business. He sells only those advantages* and *incidents which attach to the property and location, rather than those which attach to the person of the vendor.* He sells only so much of the custom *as will continue in spite of his retirement and activity.*

"He sells probabilities and not assurances." P. 449. [Italics ours.]

As a corollary of the foregoing opinion an extract may be properly selected from that of the Connecticut court in Cottrell vs. Manufacturing Company, 54 Conn. 138, in reference to what passed by a bill of sale of goods, etc., *accompanied by a transfer of the good will*, merely, viz.:

"By purchasing the good will merely Cottrell secured the right to conduct the old business at the old stand, with the probability in his favor that the old customers would continue to go there. If he desired more he should have secured it by positive agreement. The matter of good will was in his mind. Presumably he obtained all that he desired. At any rate the *express contract is the measure of his right; and since that conveys a good will in terms, but says no more, the court will not, upon inference, deny to the vendor the possibility of successful competition by all lawful means with the vendee in the same business*. No restraint upon trade may rest upon inference. Therefore, in the absence of any express stipulation to the contrary, the vendor might lawfully establish a similar business at the next door," etc. [Italics ours.]

From the foregoing it appears that good will is an advantage or benefit which is acquired by a business establishment beyond the mere intrinsic value of the capital stock; that it is the general public patronage and encouragement which a business receives from its customers on account of its local position; that it is the subject of value and price, and of bargain and sale, though intangible; but in order to be conveyed mention of it must be made of it in the act of sale.

The discussion of the rights of a vendee of good will more frequently arises in the course of liquidation of corporations and sales in partnerships than elsewhere; but, as the principle involved is the same as in cases of bargain and sale between individuals, decisions involving such transactions may be examined, along with others, in ascertaining to what extent and in what class of cases such sales involve the assignment to the vendee of the right to *use the name of the vendor*.

In Williams vs. Farrand it was held that a retiring partner could not "use *his own name* * * in such a way as to lead the public to suppose that he is continuing the old business," etc.

In Myers vs. Kalamazoo Buggy Company, 54 Michigan, 215, three partners retired from the Kalamazoo Wagon Company and thereafter organized and put into operation the defendant company. They were enjoined from prosecuting that business on the ground that they were guilty of an act of piracy, as they "*were not using their own names*" but an *assumed name*, calculated to deceive the public.

Like cases are stated in Burgiss vs. Burgiss, 3 DeGex, M. and G. 896, and in Lee vs. Hally, L. R., 5 Ch. App. 155.

In the Williams case the court states " that where an *express contract* has been made * * for the use by the purchaser of a *fictitious name* or a *trade name* or a *trade mark*, courts will enjoin the continued violation of such an agreement." Grow vs. Seligman, 47 Mich. 607; Beal vs. Chase, 31 Mich. 490; Burchardt vs. Burchardt, 36 Ohio St., 261; Tode vs. Gross, 28 N. E. Rep. (N. Y.) 469.

But the court further stated that such a stipulation need not be made in the act of sale because " an assignment of all the stock, property and effects of a business * * * carries with it the *exclusive right* to use a *fictitious name* in which such business is carried on, and such trade names and trade marks as have been in use in such business. These incidents attach to the business * * and pass with it. Courts have frequently held that a trade mark has no separate existence; that there is *no property in words* as detached from the thing to which they are applied; and that *the conveyance of the thing to which it is attached carries with it the name.*" Derrenger vs. Platt, 29 Cal. 292; Gage vs. Publishing Co., 11 Ont. App. 402; Hoxie vs. Chaney, 143 Mass. 592.

In this last case it is stated that a bill of sale conveying " all the right, title and interest in and to all and singular the partnership property belonging to the firm " was held to convey the company's trade marks for the manufacture of certain soaps pursuant to the *formulas* of Hoxie, though not mentioned; but not to convey the good will preventing Hoxie from manufacturing soaps *otherwise than by such formulas.*" Bassett vs. Percival, 5 Allen, 345; Courell vs. Manufacturing Co., 54 Com. 122.

The same proposition is stated more clearly in Prussian Cement Co. vs. LePage, 147 Mass. 201, the court holding that it was legitimate for one to sell " the use of his name as a trade mark, " *i. e.,* " as a description or designation of a *manufactured article*, so as to deprive

himself of the right to use it *as such* and confer the right upon another.''

Thus: '' One who has carried on a *business* under a trade name and sold a particular *article* in such a manner, by the use of his name as a trade mark or a trade name, as to cause the business or article to become known or established in favor under such name, may sell or assign such trade name or trade mark when he sells the business or manufacture, and by such sale or assignment *conclude himself from the use of it in a similar way.*'' McLean vs. Fleming, 96 Mass. 245; Shorer vs. Shorer, 54 Iowa, 208; Frazier vs. Frazier, 147 Mass. 208.

Many of these cases are brought forward in the Williams case, and after recapitulating these different propositions the court say:

'' These propositions are sustained by a long line of authorities, but in none of those cases does the question hinge upon a grant of good will. Complainants insist, however, that a grant of good will * * * imposes certain restrictions upon the vendors, and *inter alios*, is the *use* that may be made of their own names; '' but the court examined that question fully, and placed the proper limitation upon that contention by stating that its *sole* effect was to prevent the vendor's subsequent employment of his name so as to *impair the good will he had conveyed to the vendee.*

The court, in the Williams case, then furnishes the following appropriate illustration of the rule, viz.:

'' A partnership name may become *impersonal* after the death of the partners, and it is then likened to a *fictitious* or *corporate* name.

'' A surname may become *impersonal* when it is attached to an *article* of manufacture, and becomes the name by which such article is known in the market, and the *right to use the name* may, in consequence, follow a grant of the right to manufacture the article, or a sale of the business of manufacturing such article; and when the right to manufacture is exclusive, the *right to the use of the name as applied to that article* becomes, likewise, exclusive.''

This is followed by this conclusive statement, viz.:

'' The rule that, upon the *dissolution* of a firm *neither* party has the right to use the firm name, as well as the other rule that a *retiring partner* has no right to use the old name, are both subject to the exception that a person has the right to use *his own name* unless he has *expressly contracted otherwise.*     *      *      *      *

"The right to continue the use of a firm name, as well as a re-striction upon the use, by a retiring partner of *his own name*, are proper subjects of bargain, sale, and agreement." Hence the defendants, as retiring partners, without any restrictions having been placed 'upon them in the act of sale of their interest in the copartnership business were recognized to "have the right to use their own names or any collocation of their own names."

We can not better illustrate the principle that is involved in the foregoing decisions than by citing the case of Meneely vs. Meneely, 62 N. Y. 431, wherein an injunction restrained the defendant from in any way "using the name and designation of 'Meneely' in the business of bell founding in the city of Troy. The name of the defendant is Meneely, and he was engaged in the business mentioned. The necessary consequence of the injunction was to compel the defenlant, Meneely, either to discontinue the business of bell founding in Troy, or procure it to be done in the name of some other person. He was absolutely prohibited from the *use of his own name, in his own business, in any way.* But the court ruled that "every man *has the absolute right to use his own name in his own business, even though he may interfere with, or injure the business of another having the same name,* providing he does not resort to any *artifice* or *contrivance* for the purpose of producing the impression that the establishments are identical, or do anything calculated to mislead."

Thus the right of one to the free and unrestricted use of his own name, in a business enterprise, is so strong that his right is not impaired, even if it operate an infringement of a trade mark, so that no artifice be resorted to for the purpose of deceiving the public, notwithstanding the "owner's right of property in it is as complete as that which he possesses in the goods to which he attaches it." Derrenger vs. Platt, 29 Cal. 293; Sohin vs. Johnson, 111 Mass. 238; Holmes vs. Manufacturing Company, 37 Conn. 278.

In Browne's Law of Trade Marks, in the course of his treatment of good will, he says:

"Courts of equity will protect a party in the use of a name of an inn, hotel or other place of business, when the sign is simulated. *
* * * * * If a man creates a reputation for his business, it is as the keeper of some particular house at a known location, and it is piracy to draw off the custom of his friends, or customers who have identified him with the name of his house. It is a *personal* right.

By giving a particular name to a building as a sign of the hotel busi-ness, a tenant does not thereby make the name a *fixture to the building and the property of the landlord*, upon the expiration of the lease." Pp. and Sec. 439, 440.

Clearly such name or appellation of a hotel is not an incident of good will, as good will exclusively appertains to a given and desig-nated locality and becomes a fixture of the leased premises and at the expiration of the lease it passes to the landlord.

This is conclusively shown by the author's subsequent observa-tion, viz.:

"One may consent to the employment of his *name* as that of a place of refreshment; but if such consent be purely gratuitous, or unless there is some valid agreement binding upon the party who gives his consent he may withdraw it at pleasure and enjoin its further use."

But the argument in favor of such a withdrawal of a business is strengthened by the fact that the author only had in contemplation trade names, or fictitious names, such as St. Charles, St. James and Hotel Royal, which any one is free to use, for such a name might pass with the sale of the hotel business, and be changed at the caprice of the purchaser.

This distinction makes it clear that the employment of one's *own name* to designate his place of business can not be considered as an element of good will, for, if so—following the principles just an-nounced—it would necessarily result in its loss to the person pos-sessing it, as at the termination of the business it would pass to the proprietor of the leased premises. Having conveyed it to a suc-cessor—and we have ascertained that the disposition of good will is matter of contract—he could not thereafter come in competition with his vendee without violating his obligation of warranty. Therefore, we conclude, with Mr. Browne, that whilst the employment of *one's own name* to designate his place of business may be transferred in like manner as good will, yet if it be done by a purely gratuitous contract, in the absence of any valid and enforceable agreement for a consideration, he may withdraw it at pleasure.

The conclusion is that such an employment of his own name in business forms no part of the good will, but on the contrary it par-takes of the characteristics of a trade mark, and may be classed as a *quasi* trade mark, of which Mr. Browne says:

" It should be borne in mind that a trade mark carries the idea of a man's *personality*, like his ordinary autograph, and, therefore,. preserves its essential characteristics wherever it may go. This is not so with *quasi* trade marks, as the name of a hotel or shop of trade," etc.   Id., Sec. 90.

The distinction between trade names and trade marks is stated as follows, viz.:

" A trade mark owes its existence to the fact that it is *actually affixed* to a *vendable commodity* (Secs. 52, 382, 384), whereas, a trade name is *mere property*, allied to the good will of the business."

In Woodward vs. Lazar, 21 Cal. 449, defendants were restrained from using the name "What Cheer House," as the name of a hotel in the city of San Francisco.

Woodward, plaintiff, first erected a hotel building on a leased premises, and gave it that name.   During his occupancy as tenant, he purchased and built on the adjoining lot another hotel edifice, and occupied it also.   Afterward, he surrendered the leased premises and occupied the second, and continued to conduct a hotel business on his own premises, under the name and style of " What Cheer House."   Subsequently the defendants purchased the premises first described and conducted thereon a hotel under the original name, " What Cheer House."

In that case the contention of the plaintiff in injunction was, that the name belonged to him as the proprietor of the hotel last established, and which he both owned and occupied; and which he had theretofore used continuously while proprietor of the hotel he had leased, and up to the date of its surrender, it being a trade name.

On the other hand the contention of the defendant was, that the name was a mere designation of the building in which the business,. as first established, was conducted, and that it attached to the building at the termination of the plaintiff's lease, and passed to him by the purchase thereof from the plaintiff's lessor—it constituting a part of the good will of said property and establishment.

Denying the latter proposition, the court said:

" A person may have a right, interest or property in a particular name, which he has given to a particular house, and for which *house*, under the name given to it, a *reputation and good will* may have been acquired; but a tenant, by giving a particular name to a building which he applies to some particular use, as a sign to the business.

done at that place, does not thereby make the *name a fixture to the building and transfer it irrevocably to the landlord.*"

Thus a clear distinction was taken by the California court between the *reputation* a name or appellation gives to a certain business locality, and which adheres to it without any reference to the proprietor of the establishment, personally, and the *designation of a name for a locality* at which a certain business is carried on, and which is not impersonal, and does not attach to the property, but remains subject to the control of the proprietor.

The court, in treating of this distinction, said:

"Defendant's claim to protection, so far as his right results from the good will acquired for the name while it was applied exclusively to the leased premises, may not be maintainable;" (yet plaintiff) "is entitled to protection in the *exclusive use of the name* as proprietor of the new house."

Had the *name* of that establishment formed an element of the good will of the hotel business while it was being conducted on the leased premises by the plaintiff, it would, under all of the authorities, have passed to the landlord at the termination of the plaintiff's lease, and by his conveyance to the defendant; but as it was rather a *personal* perquisite of the *proprietor* while lessee, and not an *impersonal* ingredient of his *business*, it did not pass to the landlord, but remained subject to the control of the lessee at the termination of the lease.

Our conclusion is that on reason and authority the case is with the plaintiff. That the *name* given to a building in which a hotel is kept, which contains the *name* of the proprietor, does not constitute an element of good will, though it may tend to enhance the business *reputation* of the place or *situs* of the business establishment, which is an ingredient of good will.

That while under the authorities such a name is a marketable article and a proper subject of sale, yet it must be expressly understood in the act of sale, and if no consideration be paid, same may be subsequently recalled.

Such transactions, being esteemed to be in restraint of trade, are disfavored in commercial dealings.

In this case there is some proof of injury sustained by the plaintiff on account of the defendant's improper use of his name; yet we are disinclined to rest a judgment upon it, because we are satisfied the

defendant acted fairly and honestly, and under a mistaken belief that he had acquired a right to employ the plaintiff's name as he did.

But we are clearly of the opinion that plaintiff's injunction should be maintained and perpetuated.

It is, therefore, ordered and decreed that the judgment appealed from be annulled and reversed; and it is further ordered and decreed that there be judgment in plaintiff's favor and against the defendant, perpetually enjoining and restraining the latter from using or employing the name "Hotel Vonderbank" or "Vonderbank Hotel," as the name or style of a hotel or restaurant, at the former site of such establishment as that kept and operated by the plaintiff.

It is further ordered and decreed that plaintiff's demands for damages be rejected *in toto*, and that the defendant be taxed with the cost of both courts.

Mr. Justice Breaux having a personal interest in the question recuses himself.

Rehearing refused.