Robert S. RISO and Darlene H. Riso, Perkins Cake and Steak, Inc., Dennis P. Reed and Kathleen Doak Reed, Appellees,

v.

POTTAWATTAMIE BOARD OF REVIEW and Robert W. Knox, Chairman Thereof, Appellants.

No. 83–1030.

Supreme Court of Iowa.

Feb. 13, 1985.

Frank W. Pechacek, Jr. and Randy R. Ewing of Smith, Peterson, Beckman & Willson, Council Bluffs, for appellants.

Michael G. Reilly of Perkins, Sacks, Hannan & Reilly, and Maynard Telpner of Telpner, Smith & Sawatzke, Council Bluffs, and William J. Lillis, Des Moines, for appellees.

Considered by UHLENHOPP, P.J., and HARRIS, McCORMICK, CARTER, and WOLLE, JJ.

McCORMICK, Justice.

After unsuccessful protests to the board of review, plaintiffs appealed their 1981 real estate tax assessments to the district court. The court reduced the assessments, and defendants board of review and its chairman appealed to this court. We reverse the district court.

The questions in this case concern standing, factors relevant to using the income approach to valuation, and the amount of the valuations.

The properties involved are McDonald's, Burger King and Perkins restaurants located in Council Bluffs. McDonald's Corporation owns the McDonald's property and leases it to plaintiffs Dennis P. Reed and Kathleen Doak Reed. The Reeds are required by the lease to reimburse McDonald's for all real estate taxes on the premises. The Burger King property is owned by plaintiffs Robert J. Riso and Darlene H. Riso. The Perkins property is owned by plaintiff Perkins Cake and Steak, Inc. The county assessor determined the January 1, 1981, valuation of McDonald's as $600,000, Burger King as $650,000 and Perkins as $650,000. Protests were denied by the board of review. Upon appeal the district court reduced the McDonald's valuation to $500,000, Burger King to $450,000 and Perkins to $440,000.

I. *Standing.* Defendants contend the district court erred in overruling their motion for summary judgment against the Reeds. They alleged in their motion that the Reeds lacked standing to pursue the assessment appeal because McDonald's Corporation owns the property and they are merely lessees. Real estate taxes were paid by McDonald's, and the license agreement between McDonald's and the Reeds provided that the Reeds could not act as agents of McDonald's for any purpose. The lease, however, provided that the Reeds would promptly reimburse McDonald's for the taxes "upon receipt of a photocopy of the paid taxes receipt."

The assessment statute provides that, "Any property owner or aggrieved taxpayer who is dissatisfied with his or her assessment may file a protest against such assessment with the board of review ...." Iowa Code § 441.37 (1981). The jurisdiction of the district court is appellate. § 441.38. Because the Reeds do not own the property and do not pay the taxes directly, the issue is whether their duty to reimburse McDonald's for the taxes is sufficient to make them an "aggrieved taxpayer" within the meaning of the statute.

■ This court recognized in *Chapman Brothers v. Board of Review,* 209 Iowa 304, 307–08, 228 N.W. 28, 29 (1929), that a "person aggrieved" under a predecessor statute included lessees whose pecuniary interests could be affected by the assessment. The lessees in that case had a 99-year lease and authority from the owner to make the protest, but those circumstances were not vital under the court's definition of aggrievement. The lessees' duty under the lease to pay real estate taxes gave them independent standing to protest the assessment and pursue an appeal to the district court. In the present case, the Reeds' pecuniary interests are affected by the amount of the McDonald's assessment because they are obliged by the lease to bear the burden of the taxes. We find that the Reeds thus are aggrieved taxpayers within the meaning of the statute.

Other courts have reached the same conclusion in analogous situations. *See Ames Department Stores v. Assessor,* 102 A.D.2d 9, 11, 476 N.Y.S.2d 222, 224 (App. Div.1984) ("The cases have uniformly held that lessees of entire parcels who are obligated to pay property taxes have a pecuniary interest and, therefore, are aggrieved by unlawful assessment."); *Appeal of Marple Newtown School District,* 70 Pa. Commw. 365, 367, 453 A.2d 68, 69 (1982) ("Any person who has a direct immediate, pecuniary and substantial interest in the subject matter is a person aggrieved.").

We hold that the district court did not err in overruling defendants' motion for summary judgment.

II. *Valuation factors.* The leases on all three properties contained provisions for base rent and additional rent measured by a percentage of gross sales over a certain figure. The McDonald's and Burger King lessees paid substantial percentage rents under these provisions, but the Perkins' receipts had not been sufficient in any year to require payment of percentage rent. The assessor considered the percentage rents paid by the lessees in determining the assessment valuations of McDonald's and Burger King. Appraisal witnesses for the Reeds and Burger King testified that they did not consider percentage rents in valu-

ing those properties. They believed they were precluded by statute from doing so and, in reducing the assessments, the district court agreed with their interpretation of the statute.

The valuations are governed by Iowa Code section 441.21 (1981). Under that statute property is to be assessed at its actual value, which in this case is to be its "fair and reasonable market value." Two approaches for ascertaining market value are provided for, the "sales prices" approach and the "other factors" approach. *See Equitable Life Insurance Co. v. Board of Review*, 281 N.W.2d 821, 823 (Iowa 1979).

When the assessor cannot readily establish market value through the sales prices approach,

> then the assessor may determine the value of the property using the other uniform and recognized appraisal methods including its productive and earning capacity, if any, industrial conditions, its cost, physical and functional depreciation and obsolescence and replacement cost, and all other factors which would assist in determining the fair and reasonable market value of the property but the actual value shall not be determined by use of only one such factor. The following shall not be taken into consideration: Special value or use value of the property to its present owner, and the good will or value of a business which uses the property as distinguished from the value of the property as property.

§ 441.21(2). In the present case, the assessor found insufficient market data to use the sales prices approach. Therefore he used the other factors approach, including cost and income methods of valuation. In his income method, which he and most of the other appraisal witnesses agreed was the most reliable for the kind of property involved, he capitalized what he determined was the "economic rent" for the property. Economic rent is the income the property in its current use could reasonably be expected to return to the owner under normal circumstances. In determining the eco-

nomic rent for the McDonald's and Burger King property, the assessor considered both the base rent and percentage rent. Because of the speculative aspects of percentage rent, he and defendants' appraisal witnesses substantially discounted it in computing economic rent.

The district court found that percentage rent constituted special use or good will value of the property that was precluded from consideration by section 441.21(2). Special value or use of the property to its present owner means "sentiment, taste, or other factors, frequently subjective [which] give property peculiar value or use to its owner that it does not have to others." *Maytag Company v. Partridge*, 210 N.W.2d 584, 591 (Iowa 1973). "Features and fancies" added to a homestead for the personal delight of the owner but of no use or value to others are examples of special value or use that are not to be considered in valuation. *Id.* Good will is the value of a business that is attributable solely to public patronage and encouragement because of its local position or reputation. *Millspaugh Laundry v. First National Bank*, 120 Iowa 1, 4, 94 N.W. 262, 263 (1903). It is "[t]he favor which the management of a business wins from the public." Black's Law Dictionary 625 (rev. 5th ed. 1979).

Percentage rents were not shown to be based on either special use or good will within the meaning of section 441.21(2). They are a return on investment just like base rent. The record shows they are commonly used by lessors as a hedge against inflation. Presumably, prices and gross revenues will increase as inflation occurs. Percentage rents also provide a means for the lessor and lessee to share the risk on the investment. Base rent, of course, remains fixed over the term of the lease. The evidence also shows base rent is likely to be lower in leases with percentage rent provisions than in leases without them. McDonald's and Burger King have generally uniform lease provisions for base rent and percentage rents. They are separately

compensated for the use of their name and other factors in franchise agreements.

The Reeds and Burger King contend that percentage rents are tied to profitability and therefore to good management. They argue that, because the quality of management is unique and not dependent on the owner's investment, percentage rents are actually based on special use or good will within the meaning of the statute. The evidence shows, however, that any truly unique circumstances can be accounted for by discounting the amount of percentage rent considered in computing economic rent. The assessor was entitled to consider the use of the property as a going concern. *See Maytag,* 210 N.W.2d at 589. Owners agree to percentage rent based on predictions of what reasonably can be expected from the use of the property in typical circumstances. That substantial revenues will be generated by any of the leading fast-food restaurants of the kind involved here is no surprise. Those revenues are largely a product of the use of the property in the contemplated manner. Percentage rents thus constitute a return on investment in the same manner, if not always to the same extent, as base rent.

We find that the assessor and defendants' appraisal witnesses did not err in considering percentage rent in using the income method of valuation. Lease provisions of this kind bear on the lessor's income and are an integral factor in valuing the property through the income method. *See Helman v. Kentucky Board of Tax Appeals,* 554 S.W.2d 889, 891 (Ky.Ct.App. 1977). The district court erred in holding otherwise.

III. *Valuation amounts.* The McDonald's and Burger King assessments were challenged as inequitable and excessive. The Perkins assessment was challenged only as inequitable. Defendants raise issues concerning burden of proof and the merits of the valuation testimony. The parties agree that plaintiffs initially had the burden to prove the grounds of their protests.

Pursuant to section 441.37(1), an owner or taxpayer may protest that an assessment "is not equitable as compared with assessments of other like property in the taxing district." When this ground is relied on, the complainant must prove (1) that there are several other properties within the assessment district similar and comparable to the one at issue, (2) the amount of the assessments on those properties, (3) the actual value of the comparable properties, (4) the actual value of the property at issue, (5) the assessment complained of, and (6) that by a comparison the property at issue is assessed at a higher proportion of its actual value than the ratio existing between the assessed and actual valuations of the similar and comparable properties, thus creating a discrimination. *Maxwell v. Shivers,* 257 Iowa 575, 579–80, 133 N.W.2d 709, 711 (1965). The gist of this ground is that the property at issue is assessed higher proportionately than similar property in the area. *Id.*

Defendants argue that the burden of proof on this ground remained with plaintiffs and they failed to meet it. Their argument that the burden of proof remained with plaintiffs is two-fold. First they assert the burden never shifts to the assessor on this ground. Alternatively they assert the evidence in this case was insufficient to cause it to shift.

Section 441.21(3) provides:

The burden of proof shall be upon any complainant attacking such valuation as excessive, inadequate, inequitable or capricious; however, in protest or appeal proceedings when the complainant offers competent evidence by at least two disinterested witnesses that the market value of the property is less than the market value determined by the assessor, the burden of proof thereafter shall be upon the officials or persons seeking to uphold such valuation to be assessed.

Defendants contend that the burden of proof is permitted to shift only when the issue is whether the valuation is excessive, not when the protest is based on inequity.

We do not believe the statute should be read so narrowly. The inequity ground is a means of establishing that the market value determined by the assessor is greater, on a comparison basis, than the market value that should have been found. When a complainant produces competent evidence by two disinterested witnesses that the market value is too high because it is inequitable, we hold that the burden of persuasion on valuation shifts to the board of review. *See Maytag,* 210 N.W.2d at 596.

■ We agree with defendants, however, that plaintiffs did not offer competent evidence of inequity in this case. For there to be "competent evidence" through the opinions of "two disinterested witnesses," it was necessary for plaintiffs first to establish a foundation for the witnesses' opinions. *See Bartlett & Co. Grain v. Board of Review,* 253 N.W.2d 86, 88 (Iowa 1977). This means plaintiffs were required to offer a sufficient factual basis for the opinions to take them out of the realm of mere speculation and conjecture. *See Osborn v. Massey-Ferguson, Inc.,* 290 N.W.2d 893, 899 (Iowa 1980). Therefore if any element of the ground of protest was not supported by substantial evidence, the foundation would be insufficient to support an expert opinion on the ultimate issue.

Here the record is devoid of even a scintilla of evidence of the actual value of the properties alleged to be comparable. Figures were introduced showing the assessor's apportionment of assessed valuations to buildings on certain property and to land on others, but no evidence was introduced from which the market value of the properties alleged to be comparable could reasonably be inferred. *See Bartlett & Co. Grain,* 253 N.W.2d at 87 ("The ultimate question in tax valuation cases is the exchange value of the property as a unit ...."). We need not decide whether the foundation was also deficient on other grounds. The burden of proof on the inequity ground did not shift.

On the merits, it necessarily follows that plaintiffs failed to establish the inequity of the assessments through disinterested witnesses. We also find that they failed to establish inequity through other evidence. Therefore we conclude that plaintiffs did not show the assessed valuations were inequitable. Because the Perkins assessment was challenged only on this ground, we reverse the district court and uphold defendants' assessment of that property.

■ The Reeds and Burger King separately challenged the assessments as excessive. We have determined that the opinions of their appraisers were flawed because they gave no consideration to percentage rents. This was based on a misinterpretation of the law rather than an issue of fact. Therefore the opinions of the Reeds and Burger King experts were not competent to the extent they relied on the legal error. We will assume for purposes of review, however, that their remaining evidence showed exchange values less than those determined by the assessor. Assigning the burden of persuasion to the assessor and defendants, we find that they met their burden to uphold the assessments.

■ All but one of the experts agreed that the income method of valuation is the most reliable way to determine the market value of the properties. Apart from the refusal of plaintiffs' experts to consider percentage rents in using that method, the difference in valuation opinions is largely accounted for by the difference in capitalization rates employed by the experts for the two sides. The capitalization rates used by plaintiffs' experts ranged from 16.5 to 17.5 percent whereas defendants' experts and the assessor used rates ranging from 14 to 15 percent.

The significance of capitalization rate is that it represents the expert's judgment of the market interest rate reasonably to be expected by an investor in the property at the time involved. As the interest rate increases, the capitalized value of the investment decreases.

Plaintiffs' experts relied heavily on the national prime interest rate in selecting a capitalization rate. The national prime rate is the rate charged by certain large banks

to their preferred customers for short-term loans. The prime rate was close to its all-time high on January 1, 1981. Tight money policies of the Federal Reserve Board were a factor in pushing the prime rate to that level. The object was to chill the money supply, and the record shows the high interest rates had that effect on conventional loan sources in January 1981 in the Omaha-Council Bluffs area.

Defendants' experts showed, however, that the prime rate and conventional loan sources were not the true determiners of the market rate at the time involved here. Private individuals and groups were seeking investments for the longer term in fast-food restaurants through limited partnerships and other devices. A national market existed for such investments, and the market interest rate was substantially less than the prime rate and conventional loan rate. Defendants' experts selected a capitalization rate on the high side of those market rate figures. We believe that defendants' evidence established the rate that could reasonably be expected in the Omaha-Council Bluffs market upon investments in similar properties.

Consequently we believe the valuations arrived at by defendants' experts are more credible. They support the assessed valuations determined by the assessor. Therefore we hold that the assessor and defendants met their burden of proof.

We reverse the district court and uphold the assessor's valuations on all three properties.

REVERSED.