**EAGLE FOOD CENTERS, INC., and Clevetrust Realty Investors, Appellees,**

**v.**

**BOARD OF REVIEW OF the CITY OF DAVENPORT, SCOTT COUNTY, Iowa, Appellant.**

**No. 91–1783.**

Supreme Court of Iowa.

March 24, 1993.

John R. Martin, City Corp. Counsel, Davenport, for appellant.

Dee A. Runnels of Snyder & Schwarz, P.C., Rock Island, IL, for appellees.

Considered by LARSON, P.J., and SCHULTZ, LAVORATO, SNELL, and ANDREASEN, JJ.

ANDREASEN, Justice.

The landlord and tenant protested an increase in their 1990 tax assessment as inequitable. The board of review affirmed the assessment. The landlord and tenant then sought judicial review. The district court found the assessment was not equitable when compared with the assessment of other like properties and accordingly reduced the assessment. Both parties appealed. We affirm the district court decision.

I. *Background.*

Eagle Food Centers, Inc. (Eagle) is a tenant at the Spring Village Shopping Center (Spring Village). Spring Village is owned by CleveTrust Realty Investors (CleveTrust). In 1990, the assessed value of Spring Village was increased to $4,244,440.

On May 4, 1990, Eagle filed a protest with the Davenport Board of Review (board) to reduce the new assessment. Eagle's interest in the assessment stems from its obligation to reimburse CleveTrust a portion of the property tax. Eagle claimed the assessment was not equitable as compared with assessments of other like properties. Ten comparable properties were described and listed on the protest. *See* Iowa Code § 441.37(1)(a) (1989). The protest included an analysis of the land and building size, assessed value, and assessed value per square foot of the comparable properties.

The board upheld the assessment. Eagle and CleveTrust (hereinafter collectively referred to as Eagle) appealed to the district court. *See* Iowa Code § 441.38. Eagle again claimed the assessment was not equitable, and that the method of determining

the assessed value was arbitrary and inaccurate. Eagle also claimed the value assessed was greater than allowed by law. *See* Iowa Code § 441.37(1)(b). Eagle urged the fair assessed value was $2,833,216.

The district court concluded that the 1990 assessed valuation was arbitrary and inaccurate, and the methodology used in the application of the income approach in determining assessed value was improper. The court found the assessment was inequitable when compared with the assessments of other shopping centers in the area and held that the proper assessed value of Spring Village for 1990 was $3,342,000. The board appealed and Eagle cross-appealed.

To decide this appeal we must address the following questions: (1) can Eagle protest the 1990 assessment; (2) what grounds are available to Eagle on appeal to the district court; (3) what valuation methods were used in assessing Spring Village and other comparable properties; and (4) what assessed value of Spring Village is equitable.

## II. *Scope of Review.*

▆▆▆ An appeal of the board's action to the district court is heard in equity and issues before the board are triable anew. *See* Iowa Code § 441.39; *see also* Iowa Code § 441.43 (district court may increase, decrease, or affirm the assessment). Review of the district court decision by this court is de novo. *See* Iowa R.App.P. 4. While we are not bound by the findings of the district court, we do give them weight, especially where the credibility of witnesses is involved. *See* Iowa R.App.P. 14(f)(7).

## III. *Interim Year Assessment Protests.*

▆▆▆ We recently set forth the general principles governing protests of real estate assessments:

Pursuant to our biennial system of real estate tax assessment, the year 1989 would have been an "assessment year" and 1990 an interim year. Iowa Code § 428.4. In an interim year, assessments of real estate are made only to the extent that the property was incorrectly valued in the assessment year, not listed in the assessment year, or experiences a change in value as of the assessment year. *Id.*

To the extent a taxpayer is dissatisfied with the assessor's valuation, the aggrieved taxpayer may lodge a protest with the appropriate board of review. Iowa Code § 441.37. To this end, Iowa Code section 441.37 establishes six grounds on which a property tax assessment may be contested by the taxpayer. These six grounds correspond with the basis for protest enumerated on the petition for protest distributed by the board.

Significantly, Iowa Code section 441.37 limits protests on the basis of the first five grounds to petitions filed with the board of review "on or after April 16, to and including May 5, of the *year of assessment.*" Iowa Code § 441.37(1).

*Montgomery Ward Dev. Corp. v. Board of Review*, 488 N.W.2d 436, 438 (Iowa 1992).

This is an appeal in an interim year. It would appear Eagle is limited to the sixth basis for protest in Iowa Code section 441.-37(1), as elaborated in Iowa Code section 441.35. This, however, is not the case.

The 1989 assessed valuation of Spring Village was increased by the city assessor for 1990. This was not an increase assessment applied to a class of property or to correct a clerical or mathematical error. The assessor stated the revaluation of the property in 1990 was made because of the 1989 sale of "Toys R Us," a nearby commercial property. Based upon the sale, the assessor increased the land value from $1.75 per square foot to $2.50 per square foot. Where the assessor revalued and changed the 1989 assessment in 1990, Eagle is entitled to protest the reassessment on any of the grounds set forth in Iowa Code section 441.37.

## IV. *Protest Appeal.*

▆▆▆ The general principles controlling review of the board's decision are well established. A taxpayer challenging an assessment has the burden of proving a stat-

utory ground for protest. Iowa Code § 441.37. If the taxpayer "offers competent evidence by at least two disinterested witnesses that the market value of the property is less than the market value determined by the assessor, the burden of proof thereafter shall be upon the officials or persons seeking to uphold such valuation to be assessed." Iowa Code § 441.-21(3). Property is valued at its actual value, subject to statutory exceptions, and is assessed at 100% of the actual value, and this is the value considered as the assessed value and taxable value upon which levy is made. Actual value is fair and reasonable market value, except as otherwise provided. Iowa Code § 441.21(1), (2). No presumption exists that the assessor's valuation is correct. Iowa Code § 441.39. Only those matters raised in protest before the board of review may be asserted on appeal to the district court; only those matters raised in the district court may be considered on further appeal. Iowa Code § 441.-38.

■■■■ The preprinted "Petition to Board of Review" submitted by Eagle provided six reasons for protest which echo language from section 441.37(1). Eagle struck all but the first ground. Eagle is therefore limited in its appeal to that ground. In *Riso v. Pottawattamie Board of Review*, 362 N.W.2d 513, 517 (Iowa 1985), we set out the appropriate criteria for an appeal based on the ground that the assessment was not equitable. We stated the gist of this ground is that the property is assessed higher proportionally than other like property. *Id.* When the taxpayer produces competent evidence by two disinterested witnesses that the market value is too high because it is inequitable, the burden of persuasion on valuation shifts to the board of review. *Id.* at 518; *Metropolitan Jacobson Dev. Venture v. Board of Review*, 476 N.W.2d 726, 728 (Iowa App.1991).

Although Eagle's protest pleaded only one ground, the district court did not err in allowing testimony concerning the market value of Spring Village. Iowa Code section 441.38 expressly states "additional evidence to sustain those grounds [pled in the protest] may be introduced."

## V. *Income Approach to Value.*

■■■■ There are multiple appraisal techniques which can be used to arrive at a property's market value. Our cases indicate that the market data or comparable sales approach is to be used in determining the market value of property assessed under section 441.21 unless the market value cannot be readily established in that manner. *Heritage Cablevision v. Board of Review*, 457 N.W.2d 594, 597 (Iowa 1990). Where there is a lack of comparable sales, the assessor may use a replacement cost less depreciation or cost approach to determine market value. The cost approach was used by the city assessor in determining the value of seven shopping centers in Davenport. However, the assessor used the capitalization or income approach to determine the market value of Spring Village, Old Town, Village Shopping Center, and Walnut Center.

The income approach was first used by the city assessor to determine shopping center value in 1987. At that time, the assessor had received training on the income valuation approach and had received actual rental and income expense information from Aetna Insurance Company, the prior owner of Spring Village. The 1987 sale of Spring Village allowed the assessor to compare the sale price to the owner's net income. In using the income approach, the capitalization rate represents an expert's judgment of the market interest rate reasonably to be expected by an investor in the property at the time involved. We have recognized the reliability of the income method and the significance of the capitalization rate. *Riso*, 362 N.W.2d at 518.

At trial, Eagle called Ted Fisher as an expert witness. Fisher had been hired by the city assessor to prepare an appraisal of market value of Spring Village as of January 1, 1990. He testified the market value of Spring Village was $3,800,000. In doing so, he used the cost approach to value, arriving at a value of $4,000,000, the sales

comparison approach to value, arriving at a value of $4,500,000, and the income approach to value, arriving at a value of $3,500,000. He used a capitalization rate of 15.295% (11.795% plus 3.5% tax adjustment). While he used multiple techniques in his assessment, he believes the income approach is the most important in estimating the market value of this income-producing property.

Eagle also called J.T. Willits, an expert witness, who arrived at a fair market value by reviewing comparable property tax assessments with the Spring Village assessment. He compared both lot size and building size and computed the assessed value per square foot for the various properties. Based upon the comparisons, he believed the assessed value of Spring Village should be $2,853,000.

Terrell A. Honnold was also called by Eagle as an expert witness. He too compared the assessed value of Spring Village with other comparable shopping centers. Based upon the comparisons, it was his opinion, the assessed value of Spring Village should be $2,265,000. Both Willits and Honnold believed the 1990 assessed value of Spring Village was not equitable when compared with other shopping centers.

## VI. *Inequity.*

■ From our de novo review of the record, it is abundantly clear Spring Village was not treated the same as other like properties. We find, as did the district court, many inconsistencies in the assessment of Spring Village compared with the assessment of other like shopping centers in the area.

The city assessor adopted an income approach to determine the market value of four shopping centers. The assessor developed an "analyzation of income and expense statements" form to be used in determining the value of the property. Using the form, actual gross income is calculated by starting with potential gross income and then adjusting for vacancy delinquencies and other income. Net income is then established by deducting operating expenses

from the actual gross income. A capitalization rate is established for both the land and improvements. The land tax rate is determined by adding an interest percentage and a taxes percentage. The interest rate is to reflect a reasonable return on the investment. The taxes rate takes out of the computation the anticipated amount to be paid by the property owner for real estate taxes. The capitalization rate on improvements is determined by adding an interest percentage, taxes percentage, and a recapture percentage. The recapture percentage reflects a depreciation reserve.

The value of the property being assessed is then the capitalization of the net income; dividing the net income by the capitalization rate. Obviously, as the income increases, so does the value. However, as the capitalization rate increases, the value decreases.

When we compare the assessor's "analyzation of income and expense statements" we find only one constant figure: a 3.5% rate for taxes. The interest percentage for Spring Village was 6%, while Village Shopping Center was 7%, Old Town was 7.5%, and Walnut Center was 10%. The allowance for recapture was 2.5% for all shopping centers except Old Town; which was 3.5%. As a result, Spring Village was allowed a 9.5% capitalization rate on land value and 12% on improvements; in contrast to Village Shopping Center, 10.5% and 13%; Old Town, 11% and 14.5%; and Walnut Center, 13.5% and 16%.

Likewise, it is inequitable to allow some property owners to take deductions not permitted other owners or to add as income certain items that are not added to others.

The assessor arbitrarily afforded Old Town, Walnut Center, and Village Shopping Center a ten percent vacancy rate without any basis for the allowance, while giving Spring Village a three percent vacancy rate when its actual rate was much higher. In determining the net income of Spring Village, the assessor added $140,091 as other income because of real estate taxes paid by the tenants. None of the other shopping centers had real estate taxes paid by the tenant added to the gross income.

The appraiser used a publication, *Dollars and Cents*, which established certain methods to arrive at operating receipts and operating expenses for shopping centers in the Midwest. This publication allocated both receipts and expenses based on either dollar-per-square-foot or percentage of total receipts. The assessor applied the median decile figures to two of the shopping centers and the upper decile figures to the other two without good explanation for the difference.

Obviously, the assessment of Spring Village is not equitable when the income approach is not uniformly applied to comparable properties. It was also inequitable for the assessor to increase the land value of Spring Village 54% in 1990 while not making any adjustment as to land value of other shopping centers in the same area.

VII. *Equitable Assessed Value.*

We, like the district court, find the 1990 Spring Village assessment is inequitable when compared with the assessment of other shopping centers in the area. The district court found the most lucid testimony concerning the value of Spring Village was that of Fisher. We accept the court's evaluation of the credibility of the witness. Relying primarily on his testimony, the court found the net income of the property as of the date of the assessment to be $394,149 a year. Applying a capitalization rate of 11.795%, the district court found the market value of Spring Village to be $3,341,661.72, which it rounded to $3,342,000. Having considered the record de novo, we find the 1990 assessed value of the subject property, when compared with the assessed value of other shopping centers within the assessment district, is $3,342,000. We affirm the decision of the district court.

**AFFIRMED.**