# IN THE COURT OF APPEALS OF IOWA

_____

No. 25-0618
Filed April 15, 2026

_____

**Robert Hartig,**
Petitioner–Appellant,

v.

**Property Assessment Appeal Board,**
Respondent–Appellee,

and

**City of Dubuque Board of Review,**
Intervenor-Appellee.

_____

Appeal from Iowa District Court for Dubuque County,
The Honorable Monica Zrinyi Ackley, Judge.

_____

**AFFIRMED**

_____

Davin C. Curtiss of O'Connor & Thomas, P.C., Dubuque,
attorney for appellant.

Jessica Braunschweig-Norris and Bradley O. Hopkins,
attorneys for appellee.

Barry A. Lindahl, Dubuque, attorney for intervenor appellee.

_____

Considered without oral argument
by Tabor, C.J., and Badding and Sandy, JJ.
Opinion by Badding, J.

1

**BADDING, Judge.**

Following limited success before three other tribunals, Robert Hartig asks this court to take a fourth look at his challenge to a 2021 residential property tax assessment. Hartig's protest alleged his assessment was inequitable compared to his neighbors, who he says saw slower increases and more generous adjustments for their similar homes. The Property Assessment Appeal Board (PAAB) rejected Hartig's claims, finding his assessment was equitable. The district court affirmed the board's decision on judicial review. The primary question before us on Hartig's appeal from that ruling is whether substantial evidence supported the board's decision.

## I.      Background Facts and Proceedings

Robert Hartig owns a roughly 4,000-square-foot home on a one-acre lot in a high-end Dubuque neighborhood. In 2021, the local assessor valued Hartig's property at $673,152—up from the previous year's assessment of $612,390 due to a roughly 11% increase in dwelling value.[1] Hartig filed a pro se tax protest with the City of Dubuque Board of Review, challenging the 2021 assessment on inequity grounds. *See* Iowa Code § 441.37(1)(a)(1)(a) (2021). Among other things, Hartig argued that the assessment ignored the depreciating effect of the high-voltage transmission lines that cross his front yard. The board of review reduced Hartig's assessed dwelling value by $18,722 on that basis.

Hartig wasn't satisfied. He filed an appeal with the PAAB, asserting a claim of inequity under section 441.37. Hartig advanced two theories. Pointing to tax roll data, he first alleged that the increase in his 2021 assessment was disproportionate to more modest hikes seen by seven other

---

[1] There was no change to the value of Hartig's land.

properties in his assessment district. Hartig also argued that his property was entitled to a greater reduction for the power lines and pylons because—according to Hartig—a nearby property (the "Ryan property") had received "an effective 28% decrease" for its proximity to such lines.[2]

The PAAB rejected both arguments. With respect to Hartig's comparators, it first explained that "comparing the percentage increase of assessments is not a recognized method of supporting inequity." It also noted flaws in Hartig's "annualized" calculations, finding his property was assessed proportionately with the others in the neighborhood. As for the transmission lines, the board credited the testimony of the Dubuque city assessor, who testified that the assessment adjustment at the Ryan property was largely because of its proximity to a noisy substation. Due to the substation, as well as the Ryan property's "larger size, larger lot, higher quality, and higher value," the board found that Hartig's property was not "directly comparable" to the Ryan property. It also explained that a claim of inequity cannot be established from a single comparator.

Following an unsuccessful request for reconsideration, Hartig—now represented by counsel—petitioned for judicial review under Iowa Code section 17A.19 (2022).[3] The district court denied relief, concluding the

---

[2] Contrary to Hartig's allegations, the assessor report for the Ryan property shows that a 20% decrease was applied to the property through a settlement between the board of review and the property owner. Five percent was for the electrical "towers/lines," while 15% was attributed to a nearby substation.

[3] Hartig named the PAAB as the respondent in the chapter 17A action. The City of Dubuque Board of Review intervened in support of the PAAB's decision in the district court and on appeal.

PAAB's decision was "both supported by substantial evidence and a correct application of the law." Hartig appeals.

## II.    Standard of Review

Judicial review of a PAAB decision is governed by Iowa Code section 17A.19. Iowa Code § 441.37B(1). On appeal, this court applies the standards in section 17A.19(10) to determine whether the district court reached the correct result in granting or denying relief. *StateLine Coop. v. Iowa Prop. Assessment Appeal Bd.*, 958 N.W.2d 807, 812 (Iowa 2021).

The district court construed Hartig's petition as a request for relief under paragraph *f* of section 17A.19(10),[4] which applies when an agency action that is "[b]ased upon a determination of fact clearly vested by a provision of law in the discretion of the agency . . . is not supported by substantial evidence." The burden is on Hartig to show both error and prejudice under this standard. *Wendling Quarries, Inc. v. Prop. Assessment Appeal Bd.*, 865 N.W.2d 635, 638 (Iowa Ct. App. 2015); *see also* Iowa Code § 17A.19(10).

---

[4] Hartig contends on appeal that he also presented claims under paragraphs *d* and *h* of section 17A.19(10). In his petition for judicial review, Hartig broadly alleged that the PAAB's decision "violate[d] the provisions" of section 17A.19(10), including by departing from "the agency's prior practice or precedents" and by refusing to consider evidence that he offered in support of a request for rehearing. *See* Iowa Code § 17A.19(10)(d) (permitting judicial relief from an agency action that "was taken without following the prescribed procedure or decision-making process"), 17A.19(10)(h) (allowing relief from actions "inconsistent with the agency's prior practice or precedents"). Trouble is, the district court's ruling did not address these claims, and Hartig did not file a motion asking the court to do so. As a result, we will not consider any other section 17A.19(10) grounds on appeal. *See Hill v. Fleetguard, Inc.*, 705 N.W.2d 665, 670–71 (Iowa 2005) ("Without a ruling by the trial court for us to review, and with Hill not requesting a ruling, we will not consider this issue on appeal.").

## III.  Analysis

In Iowa, property is taxed according to its "actual value," which—for the residential property at issue here—means the "fair and reasonable market value."  Iowa Code § 441.21(1)(a), (b)(1) (2021).  In general, local assessors must determine that value "using evidence of the sales price of the property being assessed or using evidence of comparable sales."  *Boekeloo v. Bd. of Rev.*, 529 N.W.2d 275, 277 (Iowa 1995); *see also* Iowa Code § 441.21(1)(b)(1).  The department of revenue has promulgated a Real Property Appraisal Manual, which assessors are required to follow when determining market value.  Iowa Code § 441.21(1)(h).

The goal of the assessment framework is uniformity.  *See Chi. & N.W. Ry. v. Iowa State Tax Comm'n*, 137 N.W.2d 246, 253 (Iowa 1965) ("Equality of taxation, of course, requires not only a uniform rate of tax but uniformity in valuation.").  That said, "[t]he valuation of property has never been an exact science."  *Wellmark, Inc. v. Polk Cnty. Bd. of Rev.*, 875 N.W.2d 667, 672 (Iowa 2016).  Recognizing this fact, the code permits aggrieved owners to protest their property assessment on the ground that it "is not equitable as compared with assessments of other like property in the taxing district."  Iowa Code § 441.37(1)(a)(1)(a).

To prevail on a claim of inequity under section 441.37,[5] a taxpayer typically must show "that there are several other properties within the

---

[5] Neither the parties nor the district court addressed the burden-shifting framework in section 441.21 for a tax protest.  *See, e.g.*, *Compiano v. Bd. of Rev.*, 771 N.W.2d 392, 397–98 (Iowa 2009) (discussing the "two-step process" of review within the statute's burden-shifting framework).  Under the statute, the initial burden is on the property owner to put forward "competent evidence" of the ground for protest, after which the burden shifts to tax officials to defend the assessment.  Iowa Code § 441.21(3)(b)(2).  The supreme court has said that evidence is competent only if

assessment district" similar to the one at issue and that, by comparison, "the property at issue is assessed at a higher proportion of its actual value than the ratio existing between the assessed and actual valuations" of the similar properties. *Riso v. Pottawattamie Bd. of Rev.*, 362 N.W.2d 513, 517 (Iowa 1985) (citing *Maxwell v. Shivers*, 133 N.W.2d 709, 711 (Iowa 1965)). Alternatively, a taxpayer may establish inequity by showing the assessment methodology was "not uniformly applied to comparable properties." *Eagle Food Ctrs., Inc. v. Bd. of Rev.*, 497 N.W.2d 860, 865 (Iowa 1993) (finding inequitable assessment where the local assessor's income-based valuation used inconsistent factors to value similar Davenport shopping centers).

With this framework in mind, we turn to Hartig's claim that the PAAB's decision was not supported by substantial evidence. *See* Iowa Code § 17A.19(10)(f)(1) (requiring proof of a quantity and quality "that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance."). Hartig argues that he "presented a substantial body of evidence to support that his property was assessed inequitably when compared to his neighbors," including a rate-of-change comparison and an adjusted square-foot valuation. He also contends the city assessor's testimony about the Ryan property cannot be reconciled with other evidence showing the assessor applied inconsistent obsolescence adjustments in Hartig's neighborhood.

---

"consistent with the statutory scheme" for determining market value. *Boekeloo*, 529 N.W.2d at 279. The PAAB does not expressly challenge the competency of the comparator evidence offered by Hartig, although it does contend that his "calculations are not consistent with the [Iowa Real Property Appraisal Manual] or generally accepted appraisal methods." Because this issue is non-dispositive, we assume without deciding that Hartig's evidence was competent and shifted the burden of proof.

## A.     Hartig's Rate-of-Change Analysis

At the hearing before the PAAB, the assessor detailed the valuation process used to assess Hartig's property, which—"along with the rest of the city"—followed the methodology of the Iowa Property Appraisal Manual. The assessor explained that a market-condition adjustment based on 2020 home sales resulted in "an average increase of about 11%" for properties throughout Hartig's neighborhood. *See* Iowa Code § 441.47 (requiring the "equalization of the levels of assessment of each class of property" in the assessing jurisdictions every two years); *Off. of the Assessor v. Iowa Dep't of Rev.*, 417 N.W.2d 214, 216 (Iowa 1987) (explaining the use of sales studies in the equalization process). Challenging this testimony, Hartig contends his assessment hike is higher than the increases for comparable properties. He points to the gentler appreciation rate his neighbors saw on an "annualized" basis between 2019 and 2021.

The PAAB contends that Hartig's rate-of-change analysis fails on its facts.[6] We agree. A careful review of the assessment data introduced by Hartig in his administrative appeal reveals that the change in his property value is proportionate to his neighbor's increases. The following table shows

---

[6] The PAAB also suggests that Hartig's theory fails "as a legal matter" because comparing appreciation rates for neighboring properties "is not a recognized method for proving inequity under Iowa law," *see Riso*, 362 N.W.2d at 517 (setting out the traditional inequity elements), although the board acknowledges that Hartig can also show inequity under the uniformity test from *Eagle Food Centers*, 497 N.W.2d at 865. Because we agree with the PAAB's factual argument, we do not resolve this issue.

the assessments for Hartig and his comparators during the years at issue,[7] with the increased rates calculated on a one-year and "annualized" basis.

| Property | | 2019 Assessment | 2020 Assessment | 2021 Assessment | 2021 Increase | Two-Year Average |
|---|---|---|---|---|---|---|
| **Hartig (1804 Creek Wood Dr.)** | **Land** | $ 70,420 | $ 60,000 | $ 60,000 | | |
| | **Dwelling** | $ 519,580 | $ 552,390 | $ 613,152 | **11.0%** | **9.0%** |
| | *Adjusted* | | | *$ 594,430* | *7.6%* | *7.2%* |
| | **Net** | $ 590,000 | $ 612,390 | $ 673,152 | **9.9%** | **7.0%** |
| | *Adjusted* | | | *$ 654,430* | *6.9%* | *5.5%* |
| **1834 Creek Wood Dr.** | **Land** | $ 161,160 | $ 161,160 | $ 161,160 | | |
| | **Dwelling** | $ 1,919,510 | $ 1,919,510 | $ 2,142,460 | **11.6%** | **5.8%** |
| | **Net** | $ 2,080,670 | $ 2,080,670 | $ 2,303,620 | **10.7%** | **5.4%** |
| **1827 Creek Wood Dr.** | **Land** | $ 65,410 | $ 65,410 | $ 65,410 | | |
| | **Dwelling** | $ 363,480 | $ 363,480 | $ 405,420 | **11.5%** | **5.8%** |
| | **Net** | $ 428,890 | $ 428,890 | $ 470,830 | **9.8%** | **4.9%** |
| **1809 Creek Wood Dr.** | **Land** | $ 81,890 | $ 81,890 | $ 81,890 | | |
| | **Dwelling** | $ 722,410 | $ 722,410 | $ 807,410 | **11.8%** | **5.9%** |
| | **Net** | $ 804,300 | $ 804,300 | $ 889,300 | **10.6%** | **5.3%** |
| **1803 Creek Wood Dr.** | **Land** | $ 63,550 | $ 63,550 | $ 63,550 | | |
| | **Dwelling** | $ 473,210 | $ 473,210 | $ 531,130 | **12.2%** | **6.1%** |
| | **Net** | $ 536,760 | $ 536,760 | $ 594,680 | **10.8%** | **5.4%** |
| **1797 Creek Wood Dr.** | **Land** | $ 69,750 | $ 69,750 | $ 69,750 | | |
| | **Dwelling** | $ 493,790 | $ 493,790 | $ 544,400 | **10.2%** | **5.1%** |
| | **Net** | $ 563,540 | $ 563,540 | $ 614,150 | **9.0%** | **4.5%** |
| **1791 Creek Wood Dr.** | **Land** | $ 75,700 | $ 75,700 | $ 75,700 | | |
| | **Dwelling** | $ 690,150 | $ 690,150 | $ 734,300 | **6.4%** | **3.2%** |
| | **Net** | $ 765,850 | $ 765,850 | $ 810,000 | **5.8%** | **2.9%** |
| **1780 Creek Wood Dr.** | **Land** | $ 83,050 | $ 83,050 | $ 83,050 | | |
| | **Dwelling** | $ 290,970 | $ 487,220 | $ 529,290 | **8.6%** | **41.0%** |
| | **Net** | $ 374,020 | $ 570,270 | $ 612,340 | **7.4%** | **31.9%** |

Contrary to Hartig's claims, and consistent with the local assessor's testimony, Hartig's 11% dwelling value increase for 2021 was on par with the

---

[7] The adjusted numbers for Hartig's dwelling and net valuation reflect his initial success in getting the board of review to reduce his assessed dwelling value by $18,722 because of the high-voltage transmission lines.

median dwelling value increase in his neighborhood that year. Accounting for the board of review's adjustment, the change in Hartig's dwelling value was the second-lowest among his comparators. These numbers simply do not show the inequity Hartig claims.

Many of the numbers Hartig cites in support of his inequity argument fail to draw accurate comparisons between his assessment and others. For instance, Hartig points to the difference between his 2021 dwelling-value increase and the annualized appreciation rates of his seven neighbors. But that is an apples-to-oranges comparison. Because assessments in Hartig's neighborhood saw steeper increases in 2021 than in 2020—which was an interim year in the two-year assessment cycle[8]—it is unsurprising that his one-year rate-of-change exceeds the neighborhood's two-year trend.

To be sure, the comparison is more favorable for Hartig when appreciation rates are viewed on an "annualized" basis. His 9% average dwelling increase between 2019 and 2021 outpaced most of his neighbors. But the irrelevance of this multi-year comparison is immediately clear from the data. Only two properties saw dwelling value adjustments between 2019 and 2020. One was the property at 1780 Creek Wood Dr., which was only partially constructed at the time of its 2019 assessment. The other was Hartig's, which received an assessment bump for basement space that was

---

[8] Our property assessment system operates on a two-year cycle under which reassessments are performed in odd-numbered years based on market values on January 1st. *See* Iowa Code § 428.4. "In an interim year, assessments of real estate are made only to the extent that the property was incorrectly valued in the assessment year, not listed in the assessment year, or experiences a change in value as of the assessment year." *Eagle Food Centers*, 497 N.W.2d at 862.

finished the year before.[9]  In other words, both properties' 2020 dwelling-assessment increases were due to improvements.  By averaging these changes with the next year's market-condition adjustments, Hartig's "annualized" comparison disguises the fact that his comparators are not, in fact, similarly situated.

All told, we find no support for Hartig's argument that his property assessment increased at a rate of change meaningfully steeper than his neighbors'.

**B.     Hartig's "Value per Square Foot" Analysis**

Along with his rate-of-change comparison, Hartig also cites the comparator properties' "assessed value per square foot of finished area"—a metric he developed in part based on his own "experience as an architect." According to Hartig, these calculations show unexplained disparities between the home size and dwelling value in assessments across his neighborhood.  At the PAAB hearing, Hartig conceded that these valuations were based in part on his personal judgment:

> [F]or example, our home . . . , there's a two-story interior space which the other homes do not have, so I threw something in there for that.  I put a number in for second story finished space.  Now these might seem like they're arbitrary, but I'm an architect.  I've been in this profession for over forty years and estimating homes. So, I took an estimate based on my experience as a professional architect.

The PAAB contends that Hartig's appraisals are not based on "any recognized methodology" and that his "results are self-serving and flawed."

---

[9] At the PAAB hearing, Hartig conceded that his basement improvements were "probably why [his] rate went up" in 2020.

Hartig offers only a cursory explanation of his square-footage analysis on appeal. A summary introduced at the PAAB hearing suggests that he recalculated dwelling values for his home and others by assigning fixed square-footage prices to various architectural features. Among other issues, the PAAB contends this fixed-price approach was improper, citing the local assessor's testimony that values "on most of the pricing mechanisms used in the Property Appraisal Manual usually goes down as the size increases." We agree that to the extent Hartig's calculations depart from the assessment requirements of chapter 441 and the Iowa Real Property Manual, they are not evidence of inequity. *See* Iowa Code § 441.21(1)(h); *Soifer v. Floyd Cnty. Bd. of Rev.*, 759 N.W.2d 775, 782 (Iowa 2009).

But an even more fundamental problem with Hartig's square-footage analysis is that it fails to illuminate a flaw in the local assessor's valuation method. Instead, it merely presents a competing view of neighborhood dwelling values based in part on Hartig's competing professional judgment. That misses the point of a substantial-evidence review. The relevant question under section 17A.19(10)(f) is whether substantial evidence supports the agency's conclusion, not Hartig's. *Arndt v. City of Le Claire*, 728 N.W.2d 389, 394 (Iowa 2007) (explaining that whether one party's "evidence 'trumps' other evidence or whether one piece of evidence is 'qualitatively weaker' than another piece of evidence" is not for the reviewing court to decide). Here, the local assessor testified that each of the homes cited by Hartig was assessed using the Iowa Real Property Manual. He explained that the 11% increase in Hartig's 2021 dwelling assessment was based on a market-conditions adjustment, and Hartig's own comparator evidence confirms that adjustment was applied throughout his neighborhood. Substantial evidence supports the board's equity finding.

## C.     The Seattle Study

Hartig also alleges his assessment is inequitable because it did not receive an appropriate obsolescence discount for the high-voltage transmission lines that cross his property.  He contends the Ryan property received a 28% discount for its proximity to the same lines based on the findings of the "Seattle Study"—a 2013 analysis of Pacific-Northwest homes that found a negative impact in sale values for properties abutting high-voltage electrical infrastructure.[10]  The local assessor denied this allegation, testifying that the Seattle Study was referenced only "informally" during negotiations in the Ryans' tax protest and that their property's adjustment was primarily owed to noise caused by a nearby substation.  On appeal to this court, Hartig contends the assessor's testimony conflicts with other evidence in the record, including an agenda letter from the City of Dubuque's attorney describing the basis for the Ryan adjustment.

There are multiple problems with Hartig's argument.  The first is that it amounts to a credibility challenge beyond the reach of substantial-evidence review.  *See id*. at 394.  However, even if we treat it as a challenge to the uniformity of the assessor's valuations—rather than the credibility of the assessor's testimony—it still fails as a matter of law.  The rule is well established that "the showing of only one other comparable property in the area or district is not sufficient to afford relief" on an inequity claim. *Maxwell*, 133 N.W.2d at 712 (explaining "an assessment is not discriminatory unless it stands out above the general level"); *accord Metro. Jacobson Dev. Venture v. Bd. of Rev.*, 476 N.W.2d 726, 730 n.1 (Iowa Ct. App. 1991) ("[M]ore

---

[10] The Seattle Study itself is not a part of the administrative record.  But at the PAAB hearing, Hartig introduced a 2017 research review discussing the Seattle Study's results, which found an average "negative impact of 11.23%."

than one comparable property is required."). If one comparator was enough, then "an isolated instance of underassessment might result in a general reduction for all similar properties." *Miller v. Prop. Assessment Appeal Bd.*, No. 18-0929, 2019 WL 3714977, at *4 (Iowa Ct. App. Aug. 7, 2019) (quoting *Crary v. Bd. of Rev.*, 286 N.W. 428, 430 (Iowa 1939)). Hartig points to no evidence that other homes in his neighborhood have received obsolescence discounts based on their proximity to high-voltage lines. He cannot show inequity by comparison to the Ryan property alone.

Finally, Hartig's Seattle Study argument also fails on its facts. The PAAB found that Hartig's property was not comparable to the "larger size, larger lot, higher quality, and higher value" of the Ryan home. It also noted the express geographical limitations in the Seattle Study, which—according to the secondary source Hartig introduced at the hearing—is "not applicable outside the Northwest." From these facts, a reasonable person could conclude that the downward adjustment at the Ryan property was not based on the Seattle Study and that Hartig was not entitled to the same assessment reduction. That is all that is needed to affirm on a review for substantial evidence. *See* Iowa Code § 17A.19(10)(f)(1).

## IV. Conclusion

For these reasons, we affirm the district court's order denying Hartig's petition for judicial review. The PAAB's decision rejecting Hartig's inequitable assessment claim is supported by substantial evidence, and we find no merit to his counter arguments.

**AFFIRMED.**